UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BMG LABTECH, INC.<br><br>　　　　　Plaintiff,<br>v.<br><br>UNITED STATES OF AMERICA, UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection<br><br>　　　　　Defendants. | CASE NO: 26-01199 |

# COMPLAINT

COMES NOW Plaintiff BMG LABTECH, Inc. ("Plaintiff"), by and through the undersigned counsel, and alleges the following:

1. Plaintiff, BMG LABTECH, Inc. is a North Carolina corporation with principal place of business in Cary, North Carolina.

2. Relying on the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.*, hereinafter "IEEPA"), and pursuant to various executive orders issued by President Trump, Defendants have imposed tariffs on goods entered into the customs territory of the United States ("IEEPA Tariffs").

3. Plaintiff is a U.S. importer of merchandise affected by the IEEPA Tariffs and were required to pay the IEEPA Tariffs on certain entries.

4. Both this Court and the United States Court of Appeals for the Federal Circuit have ruled that these tariffs are contrary to law. *See V.O.S. Selections, Inc. v.*

1

*Trump*, 149 F.4th 1312 (Fed. Cir.), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

5. On February 20, 2026, the United States Supreme Court ruled that IEEPA does not authorize the President to impose tariffs. *Learning Resources, Inc. v. Trump*, 24-1287, slip op. at 20 (2026).

6. On February 22, 2026, the United States Customs and Border Protection issued guidance, ending the collection of IEEPA tariffs on goods entered for consumption or withdrawn from warehouse for consumption, on or after 12:00 am, eastern time on February 24, 2026. *See* CSMS # 67834313.

7. Plaintiff comes now to ask the Court to hold for it exactly as it, the Federal Circuit, and the Supreme Court have already held: that the IEEPA Tariffs and the executive orders from which they arise are contrary to law.

8. Plaintiff further asks the Court to find that since these IEEPA tariffs are contrary to law, the IEEPA tariffs paid by Plaintiff shall be refunded, with applicable interest. *See AGS Co. Automotive Sol. v. U.S. Customs and Border Protection, et. al.*, No. 25-00255 (Ct. Int'l Trade Dec. 15, 2025) (this Court confirmed its authority to reliquidate entries subject to the IEEPA duties).

9. This separate action is required because importers that have paid tariffs imposed under IEEPA, including Plaintiff, are not assured of obtaining refunds of those unlawfully collected duties absent a judgment and judicial relief in their own right.

10. This action is necessary at this time because the entries on which Plaintiff paid tariffs pursuant to IEEPA have liquidated or soon will liquidate with final assessments of those duties. Any administrative protest would be futile, as CBP lacks the discretion or authority to overturn or disregard the Executive Orders imposing the IEEPA tariffs.

11. Plaintiff is therefore entitled, as a matter of law, to a judgment from this Court ordering full refunds of the unconstitutional and unlawful tariffs at issue.

12. In this action, Plaintiff seeks: (i) a preliminary order enjoining Defendants from liquidating Plaintiff's unliquidated entries, during the pendency of this litigation and any appeals therefrom; (ii) a final determination that the IEEPA duties are unlawful; and (iii) a final judgment awarding Plaintiff a complete refund of all IEEPA duties collected from or assessed against it to date as a result of the challenged Executive Orders, as well as any such duties it continues to pay.

## JURISDICTION

13. This Court has jurisdiction pursuant to 28 U.S.C. § 1581(i)(1)(B) and 28 U.S.C. § 2631(i) because this case is a "civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for…tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." *See V.O.S. Selections*, 149 F.4th, at 1328-1331.

14. Having the same legal and equitable powers as a United States District Court, this Court may enter a money judgment against the United States and can order other remedies, *inter alia*, injunctions, writs of mandamus and prohibition, declaratory judgments, and orders of remand. 28 U.S.C. §§ 1585, 2643(a)(1), (c)(1).

## STANDING

15. Plaintiff has standing to bring this action because it is the importer of record for entries of goods subject to the IEEPA Tariffs implemented by Defendants and have therefore been forced to pay the United States unlawful duties. Payment of the IEEPA Tariffs has directly caused injury to Plaintiff which would be redressable by declaratory and injunctive relief from this Court.

## FACTUAL BACKGROUND

16. On January 20, 2025, the President declared a national emergency pursuant to sections 201 and 301 of the National Emergencies Act (50 U.S.C. §§ 1601-1651). *See* Proclamation No. 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8,327 (Jan. 20, 2025). The declaration cited as the basis for the emergency, *inter alia*, the transportation of illicit drugs, such as fentanyl, into the United States via its border with Mexico.

17. The scope of the emergency was subsequently extended to include the trafficking of certain illicit drugs from Canada and China. *See* Executive Order No. 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border,* 90 Fed. Reg. 9,113 (Feb. 1, 2025); *and* Executive Order No. 14195, *Imposing*

*Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025).

18. Predicated on this national emergency, and invoking the authority alleged under IEEPA, on February 1, 2025, President Trump issued executive orders imposing additional *ad valorem* duties on imports from China, Mexico, and Canada. *See generally* Executive Order No. 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025); Executive Order No. 14193, 90 Fed. Reg. 9,113; Executive Order No. 14195, 90 Fed. Reg. 9,121. This group of IEEPA Tariffs is hereinafter referred to as the "Fentanyl Tariffs".

19. On February 5, 2025, the President issued another Executive Order, amending the Fentanyl Tariffs as applied to China. *See generally* Executive Order No. 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,277 (Feb. 11, 2025).

20. On March 3, 2025, the President issued Executive Order No. 14228, *Further Amendment to Duties Addressing the Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025); this order again amended the Fentanyl Tariff applied to China.

21. Then on April 2, 2025, the President identified an emergency related to "underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption."

5

Executive Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025). Pursuant to IEEPA, the executive order imposed additional *ad valorem* duties on imports from around the globe. *See generally Id*. These tariffs, hereinafter referred to as the "Reciprocal Tariffs," established a 10% baseline tariff on nearly all imports to the United States, effective April 5, 2025, and additional, country-specific, "reciprocal" tariffs ranging from 11% to 50%, effective April 9, 2025.

22.     On April 8, 2025, the President issued Executive Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 14, 2025) which increased the country-specific rate applicable to China from 34 to 84%.

23.     On April 9, 2025, the President then issued another order raising China's country-specific rate to 125% and temporarily suspending the country-specific rates for all other countries. Executive Order No. 14266 *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625 (Apr. 15, 2025).

24.     On May 12, 2025, the President issued an additional executive order reducing China's country-specific rate to 10% for 90 days, at which point the rate would rise to 34%. Executive Order No. 14298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the People's Republic of China*, 90 Fed. Reg. 21,831, 21,831–32 (May 21, 2025).

25. To implement the IEEPA Tariffs, Defendant ordered changes to the Harmonized Tariff Schedule of the United States ("HTSUS") and required goods subject to the IEEPA tariffs to be entered under new HTSUS codes.

26. United States Customs and Border Protection ("CBP") is the agency responsible for classifying imported merchandise under the HTSUS and assessing and collecting any tariffs on imported merchandise.

27. On April 14 and 23, 2025, respectively, a group of private plaintiffs and twelve states brought suit in this Court challenging the Reciprocal Tariffs and the Fentanyl Tariffs. *See V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1364-65 (Ct. Int'l Trade 2025).

28. On May 28, 2025, this Court granted summary judgment in favor of the plaintiffs in *V.O.S. Selections*, holding that the Reciprocal and Fentanyl Tariffs exceeded the President's authority under IEEPA. *Id.*, at 1383.

29. On August 29, 2025, the Federal Circuit affirmed the decision of this Court. *See V.O.S. Selections*, 149 F.4th, at 1340.

30. Among its holdings, the Federal Circuit ruled that there is no "clear congressional authorization by IEEPA for tariffs of the magnitude of the Reciprocal Tariffs and Trafficking Tariffs." *Id.*, at 1336. Moreover, "[a]bsent a valid delegation by Congress, the President has no authority to impose taxes. Given these considerations, we conclude Congress, in enacting IEEPA, did not give the President wide-ranging authority to impose tariffs of the nature of the Trafficking and

Reciprocal Tariffs simply by the use of the term 'regulate…importation.'" *Id.*, at 1337.

31. Next, addressing the argument that the case *Yoshida Int'l v. United States*, 526 F.2d 560 (CCPA 1975) ("*Yoshida II*"), interpreted "regulate…importation" to authorize tariffs, the Federal Circuit said:

> …we still must conclude that the Challenged Executive Orders in this case exceed the authority provided by that interpretation of IEEPA. Both the Trafficking Tariffs and the Reciprocal Tariffs are unbounded in scope, amount, and duration. These tariffs apply to nearly all articles imported into the United States (and, in the case of the Reciprocal Tariffs, apply to almost all countries), impose high rates which are ever-changing and exceed those set out in the HTSUS, and are not limited in duration. The Trafficking and Reciprocal Tariffs assert an expansive authority that is beyond the express limitations of Yoshida II's holding and, thus, beyond the authority delegated to the President by IEEPA.

*V.O.S. Selections*, 149 F.4th, at 1338.

32. Overall, the Federal Circuit stated "[w]e affirm the CIT's holding that the Trafficking and Reciprocal Tariffs imposed by the Challenged Executive Orders exceed the authority delegated to the President by IEEPA's text. We also affirm the CIT's grant of declaratory relief that the orders are invalid as contrary to law." *Id.*, at 1340 (internal quotations omitted).

33. The Supreme Court affirmed the holding of the Federal Circuit on February 20, 2026, saying:

> The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope. In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it. IEEPA's grant of authority to "regulate . . . importation" falls short. IEEPA contains no reference to tariffs or duties. The Government points to no statute in which Congress used the word "regulate" to

8

authorize taxation. And until now no President has read IEEPA to confer such power. We claim no special competence in matters of economics or foreign affairs. We claim only, as we must, the limited role assigned to us by Article III of the Constitution. Fulfilling that role, we hold that IEEPA does not authorize the President to impose tariffs.

*Learning Resources*, 24-1287, slip op. at 20.

34. Therefore, both the Reciprocal and Fentanyl tariffs are invalid as contrary to law because they exceed the authority delegated to the President by IEEPA.

35. Plaintiff has paid duties pursuant to the IEEPA Tariffs on entries which will be imminently liquidated absent an injunction from this Court.

36. Upon information and belief, as of the time of filing this Complaint, CBP does not intend to extend liquidation for entries subject to IEEPA Tariffs.

## STATEMENT OF CLAIMS

### Count I

### The IEEPA Tariffs Are *Ultra Vires* And Invalid As Contrary To Law

37. Plaintiff hereby incorporates by reference the allegations and facts set forth in paragraphs 1 through 36 above as if set forth fully herein.

38. IEEPA does not grant the President "wide-ranging authority to impose tariffs of the nature of the Trafficking and Reciprocal Tariffs simply by the use of the term 'regulate…importation.'" *V.O.S. Selections*, 149 F.4th, at 1337.

39. The Federal Circuit affirmed this Court's prior holding that the IEEPA tariffs "exceed the authority delegated to the President by IEEPA's text." *Id.*, at 1340.

40. The Federal Circuit affirmed this Court's declaratory judgment that the Reciprocal and Fentanyl Tariffs are invalid as contrary to law. *Id.*

41. The Supreme Court affirmed the Federal Circuit's holding. *Learning Resources*, 24-1287, slip op. at 20.

42. The IEEPA Tariffs challenged herein are materially identical to those declared contrary to law in *V.O.S. Selections*. For the same reasons this Court, the Federal Circuit, and the Supreme Court determined the tariffs challenged in *V.O.S. Selections* are unlawful, the IEEPA Tariffs challenged herein are likewise unlawful and invalid from the beginning.

43. Wherefore, Plaintiff requests that this Court apply its precedent and binding decision of the Supreme Court, declare that the IEEPA Tariffs are *ultra vires* and contrary to law as applied to Plaintiff, order Defendants to refund, with interest, all sums paid pursuant to the IEEPA Tariffs that Plaintiff has paid prior to the resolution of this case, with interest as provided by law, and any other remedies this court deems just, equitable, and proper.

### Count II

### In The Alternative, IEEPA Is An Unconstitutional, *Carte Blanche* Delegation Of Legislative Authority

44. Plaintiff hereby incorporates by reference the allegations and facts set forth in paragraphs 1 through 36 above as if set forth fully herein.

45. Article 1 § 1 of the Constitution vests all federal legislative power in Congress. Article 1 § 8 of the Constitution grants Congress the power to "lay and collect Taxes, [and] Duties" and to "regulate Commerce with foreign Nations."

46. "Accompanying that assignment of power to Congress is a bar on its further delegation: Legislative power [ ] belongs to the legislative branch, and to no other." *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 672 (2025) (citing *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 472 (2001)).

47. While Congress may "'seek [ ] assistance' from its coordinate branches to secure the 'effect intended by its acts of legislation,'" courts "distinguish between the permissible and the impermissible in this sphere," according to "whether Congress has set out an 'intelligible principle' to guide what it has given the agency to do." *Id* at 672-673. (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409 (1928)).

48. The Supreme Court has stated that, under the intelligible principle test, "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred. The guidance needed is greater, we have explained, when an agency action will affect the entire national economy than when it addresses a narrow, technical issue (e.g., the definition of 'country grain elevators'). But in examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear both the general policy that the agency must pursue and the boundaries of its delegated authority. And similarly, we have asked if Congress has provided sufficient standards to enable both the courts and the public to ascertain whether the agency has followed the law." *Id.*, at 673 (citation modified).

49. However, the intelligible principle test "must do *something* to stop Congress from giving the President or an executive agency a blank check to legislate." *Id.*, at 721 (GORSUCH, J., dissenting) (emphasis in original).

50. "Members of Congress could not, even if they wished, vote all power to the President and adjourn *sine die*." *Mistretta v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting).

51. In *J.W. Hampton*, the Supreme Court conditionally affirmed Congress' delegation of the tariff power to the President pursuant to the Tariff Act of 1922, saying that, "such legislative action is not a forbidden delegation of legislative power" so long as "Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform." *J. W. Hampton*, 276 U.S., at 409.

52. "[T]he statute in question [in *J.W. Hampton*] imposed a tariff on barium dioxide at four cents per pound—and thus employed a straightforward tax rate. 42 Stat. 860. After setting the rate, Congress then authorized the President to adjust it by up to 50%, as needed to 'equalize ... differences in costs of production' between the United States and 'competing foreign countries.' *J. W. Hampton*, 276 U.S. at 401, 48 S.Ct. 348 (quoting 42 Stat. 941). In other words, the statutory rate could move only within numerically defined bounds and only if the President found specific facts. That is what sufficed to provide an 'intelligible principle' when the

Court first used the phrase." *Consumers' Rsch.*, 606 U.S., at 737, n. 15 (GORSUCH, J., dissenting).

53. IEEPA cannot survive the intelligible principle test, "the most forgiving standard this Court has devised for analyzing delegations," (quotation from *Id*. at 720. (GORSUCH, J., dissenting)), because it gives the President a blank check to legislate, *i.e.*, to impose tariffs and regulate foreign commerce, without any guidance whatsoever.

54. By granting the President the ability in IEEPA to "regulate…any transaction in foreign exchange" (50 U.S.C. § 1702(a)(1)(A)(i)), Congress has delegated its core authority to "regulate Commerce with foreign Nations." (U.S. Const. Art. 1 § 8).

55. By granting the President the ability in IEEPA to "regulate…importation" (50 U.S.C. § 1702(a)(1)(B)), Congress has delegated its core authority to "lay and collect Taxes, [and] Duties," (U.S. Const. Art. 1 § 8). *See e.g.* Executive Order No. 14194, 90 Fed. Reg. 9,117.

56. Unlike the statute in *J. W. Hampton*, IEEPA does not set a statutory rate which may move only within numerically defined bounds.

57. To impose duties under Section 232 of the Trade Expansion Act of 1962, there must be "a factual finding that an 'article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security;' [ ] the President's delegated taxation authority ha[s] a

ceiling because he [can] act only to the extent 'he deems necessary to adjust the imports ... so that such imports will not threaten to impair the national security;' and [ ] there [are] specific factors to be considered by the President in exercising his authority under s 232(b)." *V.O.S. Selections*, 149 F.4th at 1347 (quoting *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 96 S. Ct. 2295, 49 L. Ed. 2d 49 (1976)) (cleaned up, internal quotations omitted). None of these express limitations are present in IEEPA.

58. Rather, IEEPA purports to give the President the authority to decide for himself what tariff rates to apply; he has used this authority to apply tariff rates as high as 145% to goods entering the United States from virtually every country around the globe.

59. Because Congress has delegated its Tariff and Foreign Commerce powers through IEEPA with no intelligible principle, these delegations are unconstitutional. Consequently, IEEPA and its progeny, the Reciprocal and Fentanyl Tariffs, are unconstitutional.

60. Wherefore, Plaintiff requests that this Court declare that the IEEPA Tariffs are unconstitutional and contrary to law as applied to Plaintiff, order Defendants to cease assessment and collection of the IEEPA Tariffs on Plaintiff' importations, order Defendants to refund, with interest, of all sums paid pursuant to the IEEPA Tariffs that Plaintiff have paid or will pay prior to the resolution of

this case, with interest as provided by law, and any other remedies this court deems just, equitable, and proper.

## Count III

### Declaratory Judgment Pursuant to 28 U.S.C. § 2201

61. Plaintiff hereby incorporates by reference the allegations and facts set forth in paragraphs 1 through 60 above as if set forth fully herein.

62. Plaintiff's above claims constitute an actual controversy in the jurisdiction of this Court, namely, the constitutionality of IEEPA and the Reciprocal and Fentanyl Tariffs, the scope of the President's permissible authority under IEEPA, and the authority of CBP to collect such tariffs.

63. Defendants' impermissible assessment of tariffs, pursuant to IEEPA, on goods entered into the customs territory of the United States by Plaintiff, as importers of record, has caused Plaintiff actual damages as Plaintiff has been forced to pay IEEPA Tariffs to Defendant(s).

64. Wherefore, Plaintiff requests this Court exercise its equitable power to enter a declaratory judgment that the IEEPA Tariffs are unlawful with respect to Plaintiff, being either *ultra vires* and/or impermissible delegations of legislative power, and that CBP is without authority to assess and collect any such tariffs on Plaintiff's merchandise.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

a) declare that the IEEPA Tariffs are *ultra vires*, unconstitutional, or otherwise contrary to law with respect to Plaintiff;

b) order CBP to reliquidate entries that have been liquidated with IEEPA duties;

c) order CBP to liquidate all unliquidated entries subject to IEEPA duties without IEEPA duties;

d) order Defendants to refund all sums paid pursuant to the IEEPA Tariffs that Plaintiff has paid or will pay prior to the resolution of this case, with interest as provided by law;

e) award Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

f) grant any such further relief as this Court deems just and proper.

Dated: February 25, 2026

Respectfully submitted,

Shanshan Liang
**LIANG+MOONEY, PLLC**
Shanshan Liang, Esq.
Fla. Bar No. 112991
sliang@customscourt.com
2104 Delta Way, Suite #1
Tallahassee, FL 32303
(850) 893-0670

/s/ Johnathan Foege
**LIANG+MOONEY, PLLC**
Fla. Bar No. 1047550
jfoege@customscourt.com
2104 Delta Way, Suite #1
Tallahassee, FL 32303
(850) 893-0670

*Counsel to Plaintiff*